July 16, 2026

State            :

       v.             :

Quelon Page.       :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                                 :

Quelon Page.                       :

Present: Suttell, C.J., Robinson, Lynch Prata, Long, and Flaherty (ret.), JJ.

**O P I N I O N**

**Justice Long, for the Court.**  The defendant, Quelon Page, appeals from a Superior Court judgment of conviction following a trial at which the jury found him guilty of first-degree murder, conspiracy to commit an assault with a dangerous weapon, discharge of a firearm when committing a crime of violence resulting in death, and carrying a pistol or revolver without a license or permit.  Before this Court, the defendant submits that the trial justice erred in denying his motion for a new trial because the verdict was against the fair preponderance of the evidence and the trial justice's decision "failed to point to any evidence that showed [the defendant] was the shooter."  For the reasons set forth herein, we vacate the trial

- 1 -

justice's decision denying the defendant's motion for a new trial[1] and remand the matter for a new hearing on the motion for a new trial.

# I

## Facts and Travel

On September 16, 2021, a grand jury issued an indictment charging defendant with murder, in violation of G.L. 1956 §§ 11-23-1 and 11-23-2 (count one); conspiracy to commit assault with a dangerous weapon, in violation of G.L. 1956 § 11-1-6 (count two); discharging a firearm during a crime of violence, namely murder, in violation of G.L. 1956 § 11-47-3.2(b)(4) (count three); and carrying or possessing a pistol or firearm without a license, in violation of § 11-47-8(a) (count four).

## Trial

A jury heard testimony over nine days in Providence County Superior Court. The state produced seventeen witnesses: ten members of the Providence police, three expert witnesses, and four lay witnesses. The essential facts are not disputed; therefore, we recite the facts in narrative form unless otherwise noted.

---

[1] The trial justice announced her decision denying the defendant's motion for a new trial from the bench on July 21, 2023. We note that no order entered following her bench decision; defendant nevertheless filed a premature but valid appeal from the judgment of conviction. Article I, Rule 4(b) of the Supreme Court Rules of Appellate Procedure.

On May 14, 2021, Sabrina Ruiz; her two sisters, Angelicia Gomez and Saraina Roldan; and her brother, Hasan Colon, were socializing and having a "sibling day" at Ruiz's residence located at 33 Pope Street in Providence. Their mother, Cindy Rivera, also lived at 33 Pope Street in a separate unit with her husband; and, according to Rivera, she occasionally allowed her husband and other family members drive her car, a Nissan Murano (the Murano). Rivera testified that she routinely cleaned the Murano twice a week and that she parked the Murano in a parking lot across the street from the house on Pope Street.

On May 14, 2021, the siblings used the Murano to run multiple errands to and from Pope Street. That evening, Colon drove the Murano with his three sisters as passengers in the car to pick up Roldan's boyfriend, Carlos Vargas, at his house. When Vargas did not come out of the house right away, Roldan went inside to get him. While they waited, Colon received a FaceTime call from his friend, Tyreik Grundy (Grundy or the decedent), who was a few minutes away from Vargas's house. Colon told Grundy to meet him at Vargas's house; about a "minute or two" later, Grundy drove up next to the Murano in a Honda Civic (the Civic) and the two talked through the open windows of their respective cars. Colon ultimately invited Grundy to smoke marijuana at the parking lot across from 33 Pope Street (the lot). After Roldan and Vargas came out of the house and entered the Murano, both cars then headed back to the lot.

Upon arrival at the lot, Grundy parked the Civic on the right side of the Murano. After both cars were parked, Roldan, Vargas, and Gomez, who were all seated in the back of the car, exited the vehicle "at around generally the same time[.]" Grundy entered the Murano by walking behind it and using the rear driver's side door and sat behind Colon. Ruiz, who was in the front passenger seat, was on her phone "being the DJ for the car" while Grundy and Colon began to "chat" and to "roll up the marijuana to smoke." Colon was sitting sideways in the driver's seat with his back against the driver door, speaking to Grundy through the driver's seat headrest.

While he was "rolling up," Colon saw two people on the passenger side of Grundy's car, looking into it, and he testified that he was not concerned. Colon then saw the two people approach the Murano on the passenger's side, and he saw the passenger's side door open a little and then close. Immediately after, he saw the rear passenger side door open, and someone reached in and shot Grundy several times.

At trial, Alexander Chirkov, M.D., acting chief medical examiner at the Office of the Rhode Island Medical Examiner, was qualified as an expert in forensic pathology. Doctor Chirkov was the medical examiner on call on the evening of May 14, 2021, and he received a notification at approximately 9 p.m. regarding a shooting death. Upon arriving at the lot, he observed the decedent in the vehicle. On May 17, 2021, Dr. Chirkov performed an autopsy on the decedent. During the

external exam, he "observed five entrance gunshot wound[s] and three exit gunshot wound[s]." Doctor Chirkov determined the cause of death to be "[m]ultiple gunshot wound[s] to the head and torso" and the manner of death to be a homicide.

When Colon saw the person pointing the gun, he "instantly" exited the Murano and took cover behind a nearby car. From there, he watched two individuals run out of the lot towards Kossuth Street. Colon described the shooter as being dressed in all black but wearing a "red hoodie" with the hood up, and a black "COVID mask." He further described the shooter as being "not taller than the Murano, or shorter[,]" and he said that the shooter was about 5′ 9″ tall and "[a] little bit skinny." Colon testified that the other individual was wearing "a white sweater with like tie-dye colors or like a turquoise and pinkish [color,]" and Colon said that he did not have his hood up, but he did have on a blue "COVID mask[]." Colon later added that both the shooter and the other individual were wearing gloves.

Although there is some discrepancy regarding whether Gomez exited the car before or after Grundy entered, she did exit the vehicle before the two individuals approached the Murano and the shooting occurred. She testified that she saw two "kids" entering the lot in front of the Murano; she described one individual as wearing "a ski mask or something in that sort," but she did not see what the other person was wearing "because they were kind of like so close to each [o]ther, like shadowing each other."

Ruiz did not see the shooter. Upon hearing the shots, Ruiz crouched down on the floor in front of her seat before "jump[ing] out" and "crouch[ing] down" outside of the Murano. Ruiz then ran to her house, before returning to the lot; and at some point, she called 911. Ruiz agreed that the scene in the lot after the shooting was "chaotic and hectic," and she noted that four or five people had gathered there, some of whom checked on Grundy and some of whom opened the doors of the Murano.

Providence police thereafter arrived at the lot. Carla Cavanaugh, a Bureau of Criminal Identification (BCI) detective with the Providence Police Department, processed the scene. This included walking and photographing the scene, as well as identifying and seizing evidence from the scene. Items seized included a blue knit hat, a cell phone charging cord, a spent .40-caliber cartridge casing, a cell phone, a water bottle, "a rusty, what appeared to be spent[,] cartridge casing," and a liquor bottle. Detective Cavanaugh used a cyanoacrylate fuming chamber, which she described as "a closed chamber where nonporous items are placed in order to reveal any latent fingerprint activity" to check some of the aforementioned evidence for fingerprints; none were present. She also swabbed some of the evidence for DNA.

The Murano and the Civic were towed from the lot to the "BCI processing well[,]" to which only BCI detectives have access. At trial, Det. Cavanaugh indicated that she processed the Murano on May 17, 2021, and the Civic on May 18, 2021; however, at a prior hearing, she indicated that the Murano was processed on

May 20, 2021. On cross-examination, when asked about the discrepancy, Det. Cavanaugh testified that she "had [her] dates mixed up."

While processing the Murano, Det. Cavanaugh swabbed parts of the vehicle for DNA, including a "small view window behind the passenger side rear passenger door." Within the Murano, she also seized five spent .40-caliber cartridge casings, which did not yield any fingerprints; she ultimately swabbed the casings for DNA. The shell casings were "individually packaged, sealed, and sent to the Rhode Island State Crime Lab"; the parties stipulated that the five .40-caliber shell casings seized from the Murano and the .40-caliber shell casings seized from the lot were discharged from the same weapon.

Some of the swabs from the Murano were submitted to the Rhode Island Department of Health (DOH), where they were tested for DNA by Rachel Vele, who worked as a forensic scientist for DOH in 2021 and was qualified as an expert in DNA analysis. Swabs submitted from the Murano included that of the rear passenger-side exterior door handle, the rear passenger-side exterior window frame and the top of the exterior window glass, the rear interior passenger-side door frame, a smudge from a possible latent print on the rear passenger-side window (the smudge), and a swab of the cartridge casings found inside. An "insufficient amount of DNA" was detected on the swabs of the rear passenger-side exterior door handle and the cartridge casings.

She did, however, find DNA on the remaining three swabs and was able to develop a DNA profile for each. First, the DNA profile from the rear passenger-side exterior door window and the top of the exterior window glass "was consistent with a mixture of at least two sources of DNA, and the major component was consistent with the known profile of [Tyreik] Grundy." Second, the DNA profile on the rear interior passenger-side door frame "was consistent with a mixture from at least three people or three sources of DNA, and the major component was consistent with an unidentified female donor" and "Grundy [was] excluded as a possible contributor to this mixture." Third, the DNA profile from the smudge "was consistent with a mixture of at least two individuals or two sources of DNA" and "[t]he major component was consistent with an unidentified male contributor, and there was limited data for the minor contributor, so no conclusions were made regarding the minor contributor."

According to Cara Lupino—a supervisor and technical leader at the Rhode Island Department of Health and Forensic Biology and DNA Laboratory, who was qualified as an expert in the area of forensic DNA analysis—the swab of the smudge was entered into the DNA database, where it matched with defendant. She then issued a report to the Providence Police Department to "provide them with an investigative lead and the name of the individual that the profile matched to." She testified that with "[a]ny DNA database match we always say that this match should

be considered an investigatory tool only, and following submission of a legal reference sample for comparison analysis an additional DNA report will be issued." After receiving and analyzing a sample of defendant's DNA, Lupino compared the profile from the smudge to defendant's profile; she determined that "the major component of [DNA from the smudge] was consistent with the reference buccal sample from Mr. Quelon Page." Lupino testified that "the probability of randomly selecting an unrelated individual exhibiting the same DNA profile as the major component from the swab from the smudge * * * is approximately one in 147 sextillion."

Both Vele and Lupino testified that DNA can be transferred either directly or indirectly from one item to another. Lupino explained that "[i]ndirect [transfer] could be that all of these papers that I've been handling and I pass them off to somebody else, my DNA from these papers could be transferred to their hand, which would be an indirect transfer of DNA." Vele also gave the following example of indirect transfer:

> "So if I would touch the surface here and then maybe take my cup and put it on the surface where my DNA is, and then the DNA is transferred to my cup, then it could potentially also be transferred to another part of the surface that I didn't touch."

In conducting their investigation, the Providence police also reviewed surveillance video obtained from different locations. After extracting and reviewing

the surveillance footage, Francisco Colon, a sergeant with the Providence Police Department and the lead investigator in the case,[2] developed a description of what he believed to be the suspect vehicle in this case: a white two-door Infiniti, with dark tinted windows and a moon roof (the Infiniti). Within "a couple of days" of the homicide, Sgt. Colon provided the description to the patrol supervisor in "the area where the homicide occurred" and to members of the violent crime task force.

On May 18, 2021, Sgt. Colon responded to a property at 92 Bowdoin Street after receiving a call from Officer Matthew Rousseau, a patrolman with the Providence Police Department. There, a vehicle consistent with the description of the suspect car was parked in the driveway bearing Rhode Island license plates. While wearing a body-worn camera, Officer Rousseau and his partner approached the vehicle, where defendant was in the driver seat and Gervonnie Page was in the passenger seat. Officer Rosseau testified that he had encountered defendant before in a similar car with Massachusetts plates. When Officer Rousseau asked Gervonnie if the Infiniti was his, he said no; when Officer Rousseau asked Gervonnie if the Infiniti was defendant's car, Gervonnie said yes. The car was ultimately towed to the BCI well because it was determined to be an unregistered vehicle and that the plates belonged to a different vehicle. The defendant and Gervonnie were detained

_____

[2] At the time of the investigation, Sgt. Colon was a detective in the Investigatory Bureau of the Providence Police Department.

in separate marked police vehicles and brought back to the police department. Both he and Gervonnie were released that same day.

Two cell phones had been seized from Gervonnie's person at the time he was taken into custody—of note was a black iPhone. When asked at the scene, defendant indicated that he did not have a phone. Detective Theodore Michael, who was qualified as an expert in both forensic cell phone examinations and cell site location analysis at trial, testified that defendant later stated that the black iPhone "was a female's phone" and provided his own phone number to Det. Michael upon being asked. Detective Michael obtained a search warrant the following day, on May 19, 2021, to perform a forensic extraction on the iPhone. Detective Michael also obtained a search warrant for the call detail records for the phone number defendant had provided to him. He ultimately determined that the phone number defendant provided was the only number associated with the black iPhone. Numerous text messages extracted from the iPhone appeared to be sent to defendant. Additionally, the internet search history from May 17, 2021, included searches related to the shooting at issue in the case at bar.

After obtaining a search warrant, Det. Michael also used the phone records to conduct cell site location analysis (CSLA) of the iPhone to determine its approximate location on May 14, 2021. Detective Michael also testified that CSLA

is not as accurate as a GPS ping; indeed, the location data provided contained error radiuses, in some cases over half a mile.

Utilizing the surveillance video, Det. Michael testified that the CSLA of the iPhone correlated with the suspect car's travel. We note that offsets had to be calculated for several of the videos whose time stamps did not reflect the actual time.[3] His ultimate conclusion was as follows:

> "So I know that the device stayed in the area of Bowdoin/Pope Street/Kossuth Street/lower Manton Avenue. So I know the device is generally driving in that same area. It connected off multiple cell towers, and it even started in a northerly direction. It went southerly, it would go west, it then came back east. But the consistent -- but the thing that I saw was it stayed in the same area and it wasn't outside of that area, like in the north end of the city, the south side of the city, or even half a mile left, right, north, or south."

After the state rested, defense counsel moved for a judgment of acquittal, pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. After hearing arguments on the motion, the trial justice denied the motion. The case then went to the jury. During deliberations, the jury sent the following question to the trial justice: "If we were to determine that Mr. Page did not fire the gun to kill Mr. Grundy, but was at the scene and involved in a conspiracy to commit the murder,

---

[3] "Offset" in the context of investigations involving video surveillance refers to "the time between what a current real time would be and the live time that's currently on screen."

would Mr. Page still be charged with First or Second degree murder?" In her response, the trial justice stated, "Only if you find that the State has proven beyond a reasonable doubt that the Defendant fired the gun that killed Tyreik Gr[u]ndy, and all other elements in Count 1, may you find the Defendant guilty of either first or second degree murder." On May 9, 2023, the jury returned a guilty verdict on all counts.

## Motion for a New Trial

The defendant thereafter filed a timely motion for a new trial, challenging the weight of the evidence and arguing that the jury misapplied the law, to which the state objected. On July 21, 2023, the trial justice heard arguments from both parties and then rendered a bench decision denying defendant's motion for a new trial.

In conducting her analysis, the trial justice noted:

> "The case presented to the jury was entirely circumstantial in nature. There was no eyewitness at trial who placed the defendant at the scene of the murder, who testified that the defendant was operating the two-door white Infiniti on May 14th, 2021, or who testified that the defendant was wearing a red hoodie on May 14th, 2021."

She stated that "[t]he evidence offered at trial tied the defendant to the shooting in three ways: A car, a cell phone, and DNA on the small rear window on the passenger side of the Murano."

She first addressed the car, indicating that "[t]he [s]tate presented numerous videos in and around Providence roughly 25 minutes before and 25 minutes after the

- 13 -

murder" and about which "[v]arious Providence police detectives * * * offered testimony focusing on a distinctive-looking, light-colored, two-door, newer model coupe with heavily tinted windows and a moonroof that was observed in each of the videos that were extracted." She also noted that one video revealed an "Infiniti" symbol on the car. She then described in detail certain video evidence putting that car at the scene and outlining the events of the evening.

The trial justice discussed witness testimony, specifically describing Colon as having "the best vantage point sitting in the driver's seat of the Murano leaning with his back to the driver's door and facing the passenger side as he chatted with Tyreik Grundy through the raised head rest." She stated that he did not "see the faces of either assailant," but she laid out his description of both the shooter and the second subject, noting that Colon "acknowledged on cross-examination that he, Hasan Colon, had stated to police in his interview previously that both subjects wore gloves." She also discussed officer testimony tying defendant to a "white two-door Infiniti with heavy tint[,]" which defendant told Officer Rousseau belonged to a "female friend." She noted defendant's argument that "no witnesses testified that the defendant was seen using [the] two-door, newer model, white Infiniti with heavy tint and a moonroof on May 14th, 2021[,]" before turning to the cell phone evidence.

The trial justice began her discussion of the cell phone evidence by noting that, according to testimony of Officer Rousseau as reflected in his body-worn

- 14 -

camera, defendant denied owning the cell phone that was in the Infiniti the day defendant was in it, even though a cell phone extraction revealed it "had all of the hallmarks of being used by the defendant himself." She indicated that the extraction also revealed "a 25-minute block of time in which the cell phone is used to conduct an Internet search into the investigation of the May 14th murder of Tyreik Grundy." She further highlighted Det. Michael's testimony "that the location of that cell phone at various points in time on May 14th, 2021, both before and after the murder, was consistent with the travel of" the Infiniti as established by the video evidence.

Addressing defendant's argument that the historical CSLA data indicates that the cell phone "was not even close to the lot across from 33 Pope Street or in front of the residence at 64 Kossuth Street at" the time of the incident, the trial justice indicated that "as raised by the defense, there is a margin of error up to 59 seconds for each of the videos extracted * * *." The trial justice, therefore, stated that "[b]ased upon defendant's own argument, the jury could reasonably conclude that the margin of error in the [extracted videos] accounts for the difference in time in where the cell phone was generally located at 8:55:44 seconds."

The trial justice then turned her analysis to the DNA profile from the smudge on the small rear window of the passenger side of the Murano, which was consistent with the reference sample collected from defendant. She stated that, on cross-examination, both DNA expert witnesses

"acknowledged that DNA can be transferred to an object by directly touching that object and shedding DNA in the process, or by indirect transfer, i.e., where DNA is transferred to one item by touch, but then that item comes into contact with a second item and the DNA can be transferred to that second item without the person ever having touched that second item."

She also noted that both witnesses "agreed" that "it is not possible to determine how the DNA came to be in that location or on that object nor is it possible to determine how long the DNA had been there." The trial justice highlighted defendant's challenges to the DNA evidence: that the scene had been contaminated and that Colon described both assailants as wearing gloves. She rejected defendant's argument that "after [defendant] having brought up the principle of indirect transfer, it was the State's obligation to establish that DNA can be transferred by indirect transfer with the gloves being the intermediary." She found that

"it was not an unreasonable inference for the jury to conclude that it was the defendant's DNA on the rear window of the Murano, that it could only have been placed there less than a week before the murder because of the frequency with which Cindy Rivera washed her car, that being the Murano, and that it could be transferred from direct skin contact other than a gloved hand such as an elbow or arm in the tight space between the cars or that it could have gotten there through indirect contact."

The trial justice then determined that, "the totality of the circumstantial evidence supports a reasonable inference being drawn that the defendant's DNA got there on

the night of the murder when the shooter had contact with the Murano and that the defendant is the shooter."

The trial justice ultimately concluded that reasonable minds could differ in determining that the "circumstantial evidence and the cross-examination by counsel amount to [proof] beyond a reasonable doubt that the defendant was the shooter; that he murdered Tyreik Grundy in the first degree; that he did so by discharging a firearm; and that he conspired with an unknown, unidentified individual to commit that murder." She therefore denied defendant's motion for a new trial.

On October 3, 2023, the trial justice sentenced defendant to two consecutive life sentences for murder and for discharging a firearm while committing a crime of violence resulting in death; she also imposed a six-year sentence for count two, to be served consecutively with count one, and a ten-year sentence for count four, suspended with probation, to be served concurrently with count one. The judgment of conviction entered on January 3, 2024. The defendant filed a premature but valid notice of appeal on October 6, 2023.

## II

## Standard of Review

"This Court's review of a denial of a motion for a new trial is deferential because the trial justice is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *State v. Garcia*, 354 A.3d 620, 630 (R.I. 2026)

- 17 -

(quoting *State v. Vidot*, 253 A.3d 401, 409 (R.I. 2021)). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *Id.* (quoting *Vidot*, 253 A.3d at 409).

## III

## Discussion

Under Rule 33 of the Superior Court Rules of Criminal Procedure, "the court may grant a new trial to the defendant if required in the interest of justice." "When considering a motion for a new trial [based on the weight of the evidence], the trial justice must undertake a three-step analysis: (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *Garcia*, 354 A.3d at 630 (quoting *Vidot*, 253 A.3d at 409). "If the trial justice does not agree with the jury's verdict, the trial justice must [proceed to a fourth step and] determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." *State v. Pittman*, 160 A.3d 1015, 1018 (R.I. 2017) (deletion omitted) (quoting *State v. Texieira*, 944 A.2d 132, 140 (R.I. 2008)). In conducting our review, we examine the record of the decision on the motion for a new trial and consider whether it

"reflect[s] a few sentences of the justice's reasoning on each point" of the motion for a new trial analysis. *State v. Guerra*, 12 A.3d 759, 766 (R.I. 2011) (quoting *State v. Banach*, 648 A.2d 1363, 1367 (R.I. 1994)).

On appeal, defendant argues that the trial justice erred in denying defendant's motion for a new trial because the weight of the evidence did not establish that defendant was the shooter and further argues that the trial justice's decision "failed to point to any evidence that showed [defendant] was the shooter."

Our close inspection of the record of the decision on the motion for a new trial leads us to agree in part. Although the trial justice provided a comprehensive and extensive analysis of the evidence that tied defendant to the *shooting* and explained that she found all of the state's witnesses to be credible, her decision does not reflect how she, acting as the thirteenth juror, weighed the evidence and the inferences drawn therefrom to explain her basis for concluding that the evidence was so nearly balanced that reasonable individuals could differ regarding defendant's culpability as the *shooter*. *See Banach*, 648 A.2d at 1367 n.1 (acknowledging that the trial justice as the thirteenth juror might not necessarily agree with the jury but instead conclude "that the evidence and the reasonable inferences drawn therefrom are so nearly balanced that reasonable individuals could differ"). Rather, she stated:

> "From all of the evidence presented, and acknowledging the points raised by the defense on cross-examination, the credibility of the State's witnesses was unchanged. They each offered credible testimony. Given the entirely

- 19 -

circumstantial nature of this case, which the jury was instructed on as being permissible, the jury was presented with the ultimate question: Does all of the circumstantial evidence and the cross-examination by counsel amount to prove beyond a reasonable doubt that the defendant was the shooter; that he murdered Tyreik Grundy in the first degree; that he did so by discharging a firearm; and that he conspired with an unknown, unidentified individual to commit that murder.

"This Court concludes that reasonable minds could differ in finding that the State proved beyond a reasonable doubt that the defendant committed each of these offenses. Accordingly, the [c]ourt is required to deny the motion for a new trial."

To be sure, the trial justice found that the jury could infer that "the defendant's DNA got [on the Murano] on the night of the murder when the shooter had contact with the Murano and that the defendant is the shooter." Confusingly, however, she also concluded, without explanation, that "reasonable minds could differ in finding that the State proved beyond a reasonable doubt that the defendant committed each of these offenses." Without the trial justice having articulated "sufficient rationale" on this point, we have difficulty reviewing her "individual assessment of the evidence * * * in light of the charge to the jury," and thus we cannot say that she fully discharged her obligation as the thirteenth juror.[4] *Banach*, 648 A.2d at 1367.

---

[4] The trial justice's unexplained conclusion also appeared to depart from the reasonable inferences in support of defendant's guilt that she presumed the jury had drawn in reaching its verdict. That discrepancy suggests that she *may* not have agreed with the jury's verdict, at least with regard to whether the defendant was the shooter. But if that was the case, our standard requires that she say so on the record

- 20 -

The failure to articulate adequate grounds presents a particular challenge in this case, where all agree that the state's evidence was highly circumstantial, and where the jury note indicated that some jurors were struggling with deciding defendant's culpability for the charged offenses.

On the record before us, we are not satisfied that the trial justice has stated adequate grounds for denying the motion for a new trial because she failed to state her reasoning as to the weight of the evidence, whether she agreed or disagreed with the jury's verdict, or why she concluded that the evidence in this case was so nearly balanced that reasonable individuals could differ regarding the defendant's culpability as the shooter. *Banach*, 648 A.2d at 1367 n.1.

## IV

## Conclusion

For the reasons stated herein we vacate the trial justice's decision denying the defendant's motion for a new trial and remand the case to the Superior Court for a new hearing on the defendant's motion for a new trial.

The papers may be remanded to that tribunal.

---

and then proceed to step four of the analysis to determine whether the verdict was against the fair preponderance of the evidence and failed to do substantial justice. *State v. Pittman*, 160 A.3d 1015, 1018 (R.I. 2017). The trial justice made no such finding, however; and that omission, in light of the findings she did make on the record, further supports our conclusion that remand is necessary so that the trial justice can more clearly articulate her personal assessment of the evidence, and whether she would have reached a result different from the jury.

- 21 -

**Chief Justice Suttell, dissenting.** I dissent because I do not believe that the trial justice erred in discharging her responsibilities as a so-called thirteenth juror on a motion for a new trial. *See State v. Garcia*, 354 A.3d 620, 630 (R.I. 2026).  She comprehensively analyzed the evidence in light of the jury charge, finding all of the state's witnesses to be credible, and, I believe, she adequately explained her reasoning as to how she reached her conclusion that "reasonable minds could differ in finding that the [s]tate proved beyond a reasonable doubt that the defendant committed each of [the charged] offenses."  I acknowledge that this is a very close case.  Nevertheless, I would affirm the decision denying the defendant's motion for a new trial.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Quelon Page. |
| **Case Number** | No. 2025-50-C.A. (P1/21-2929AG) |
| **Date Opinion Filed** | July 16, 2026 |
| **Justices** | Suttell, C.J., Robinson, Lynch Prata, Long, and Flaherty (ret.), JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General<br><br>For Defendant:<br><br>Camille A. McKenna<br>Rhode Island Public Defender |